IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| Michelle Williams and Ricky Bolder, as Personal Representatives of the Estate of Yvette Williams (deceased),<br><br>        Plaintiffs,<br><br>vs.<br><br>Officer Claude McCarley and the City of Rock Hill,<br><br>        Defendants. | C/A No. 0:12-cv-1469-JFA<br><br><br><br>**ORDER** |

      This matter comes before the court on Defendants' Motion for Summary Judgment in this wrongful death action, stemming from the police shooting a fifteen-year-old girl who brandished a B.B. gun pistol at police after robbing a store at gunpoint. (ECF No. 33). Officer Claude McCarley and the City of Rock Hill ("Defendants") argue that Officer McCarley was not the officer who actually shot and killed the girl. Officer McCarley was the second officer to arrive at the scene, after Officer Culbreath had already fired the first of several shots. Michelle Williams and Ricky Bolder ("Plaintiffs"), as personal representatives of the estate of the girl, argue that a genuine dispute of material fact remains as to who fired the fatal shot.

**I.    FACTUAL AND PROCEDURAL HISTORY**

      On June 4, 2009, Officer Claude McCarley was on routine patrol, as a City of Rock Hill police officer. On that same day, Yvette Williams robbed the Park Street Grocery Store at gunpoint. The gun used by Ms. Williams was a B.B. gun pistol, which appeared to be a real pistol. Ms. Williams fled the Park Street Grocery with the gun and a wad of stolen cash. A

1

citizen, Bobby Cornwell, called 911 and followed Ms. Williams. Mr. Cornwell directed the police to Ms. Williams.

### i.     Video Recording of the Shooting

The following facts are derived by viewing the videos from the police cruiser dash cams of Officers Culbreath and McCarley. Unfortunately, a tree blocks the view of some of the event.

Officer Carlos Culbreath was the first officer to locate Ms. Williams. He approached in his police car, with Ms. Williams running down the sidewalk to his right. When Officer Culbreath exited his car, Ms. Williams stopped running and brandished the gun at Officer Culbreath. Officer Culbreath fired five shots[1] and Ms. Williams fell partially to the ground. Officer McCarley then arrived on the scene. As Officer McCarley arrived, or shortly thereafter, three shots[2] were fired. Ms. Williams fell completely to the ground, presumably lying flat on her back.[3] Two more shots[4] were fired. The parties agree that none of the ten shots just described were fatal.

At this point, Officer Culbreath approached Ms. Williams, shouting verbal commands. Ms. Williams kicked her feet[5] in the air as Officer Culbreath approached her, and Officer McCarley approached Officer Culbreath's vehicle on foot. The final two shots were fired and Officer Culbreath took the B.B. Pistol from Ms. Williams. The parties agree that one of these

---

[1] That Officer Culbreath fired these shots is indisputable, because no other officer was present at the scene.
[2] These shots were most likely fired by Officer Culbreath because Officer McCarley's car came to a stop as these shots were being fired.
[3] At this point, a tree blocks much of the view of Ms. Williams.
[4] It is unclear from the video exactly who fired these shots, but these shots sound different than the other shots. This difference in sound could be attributable to many different things, but it is not likely due to different types of guns or bullets. Both Officers McCarley and Culbreath carried a "Glock 22," according to a chain of custody record. Based on the other evidence in the record—mainly that Officer McCarley did fire shots and the timing in the video—it seems likely that these shots were fired by Officer McCarley.
[5] Again, a tree made it impossible to see most of Ms. Williams' body at this point.

two shots was the fatal shot.  Ms. Williams moved her legs slightly within the seconds after the final two shots.  She did not move again.  The video clearly shows gun-smoke emanating from Officer Culbreath's gun at the same time the final two shots are fired.

### ii.     Other Evidence in the Record

The Plaintiffs and Defendants paint different pictures as to what happened behind the tree and as to which officer fired which shots.  Plaintiffs admit that Officer Culbreath was authorized to use deadly force against Ms. Williams upon Officer Culbreath's arrival at the scene.  (ECF No. 37, p. 1).  Plaintiffs argue, however, that the authorization to use deadly force ended when Ms. Williams was initially shot and disabled, and that it was Officer McCarley—not Officer Culbreath[6]—who fired the fatal shot.

Autopsy reports indicate that Ms. Williams' cause of death was a gunshot wound to the right cheek area, and a resulting transection of the upper spinal cord.  An affidavit from the coroner who performed the exam, Sabrina Gast, confirms that Ms. Williams died from a gunshot wound in the "right cheek/temporal area of the head."  Ms. Gast also stated, by way of affidavit, that gunshot wounds to the right wrist and left shoulder of Ms. Williams were not fatal.  Attached to Ms. Gast's affidavit are pictures of Ms. Williams' corpse, showing the entry wound of the bullet in the right cheek area and the final resting place of the bullet in the left side of the back of the neck.

Unfortunately, one of the autopsy reports states that the bullet entered on the *left* cheek, not the right cheek.  In the same section, the report describes that the path of the bullet was "right

---

[6] Officer Culbreath is not a party to this action.

to left, front to back and downward." This is obviously inconsistent with a bullet entry on the left cheek. The Gast affidavit, the other autopsy report, and the photographs show that the bullet entered on the right cheek/temporal area. Defendants argue—and the court agrees—that the one statement in the autopsy report, saying that the entrance wound was on the left cheek, was made in error.

Plaintiffs, however argue that the bullet did in fact enter from the left cheek, meaning that Officer McCarley's shots could have struck Ms. Williams. Defendants—and Plaintiffs' expert—argue that the angle from which Officer McCarley fired his shots precludes the possibility that a shot fired by Officer McCarley entered on the right cheek. (ECF No. 33-5, p.9). In an attempt to dispute the conclusion that Officer McCarley could not have fired the fatal shot, Plaintiffs submitted an "expert" affidavit[7] from Charlie Mathis, stating that the photo of Ms. Williams—showing the bullet entrance on the right cheek—"could possibly be a reverse photography photo."

There are also various eyewitness statements and affidavits in the record, as well as both the statements and affidavits of Officers Culbreath and McCarley. Officer Culbreath stated in his affidavit that Ms. Williams was reaching for the gun again, prompting him to fire the final two shots. Officer McCarley does not state, in his affidavit, whether Ms. Williams was reaching for the gun when Officer Culbreath fired the final two shots. Instead, Officer McCarley states only that Ms. Williams was rolling to her left. Other eyewitness accounts—submitted as affidavits—state that Ms. Williams did not have the gun near her. The citizen who followed Ms.

---

[7] This affidavit does not speak to the expert's qualifications, other than to say he has been a photographer for more than thirty years. Further, the affidavit references various photos, but does not specifically state which photos the affiant viewed.

4

Williams from the Park Street Grocery, in his witness statement, said that the officers shot because Ms. Williams would not drop the gun.

Officer McCarley's statement, taken the day after the incident, varies from his later-filed affidavit. Most importantly, in the statement, Officer McCarley states that Ms. Williams was reaching for the gun as the final shots were filed. He also indicates that he discharged his weapon concurrent to the final shots. In his affidavit, Officer McCarley states that he did not fire at this point. This is consistent with the video.

Officer McCarley attached two photos to his affidavit, showing what he alleges to be the resting place of the two bullets he fired: one in a tree and one in a telephone pole. His affidavit says that the bullet in the tree was inconsistent with the direction in which Officer Culbreath was firing, and says that the telephone pole is "where one of my two shots hit." Finally, Officer McCarley states that the right side of Ms. Williams' face—where the record shows she sustained the gunshot wound—never faced him.

**II.    LEGAL STANDARD**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered when a moving party has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Summary judgment should be granted in those cases where it is clear that there remains no genuine dispute as to material fact and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trs. of Mayland*

5

*Cmty. Coll.*, 955 F.2d 924, 928 (4th Cir. 1992). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III.    ANALYSIS

Plaintiffs assert four causes of action: (1) the Eighth Amendment's prohibition of cruel and unusual punishment; (2) the Eighth Amendment's derivative prohibition of deliberate indifference to Ms. Williams' serious medical need; (3) excessive force; and (4) wrongful death.

Both of the Eighth Amendment claims are dismissed because Ms. Williams was never convicted or made a prisoner. *Ingraham v. Wright*, 430 U.S. 651, 671, n. 40 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions … the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of *prisoners* constitutes the 'unnecessary and wanton infliction of pain,'… proscribed by the Eighth Amendment.") (emphasis added).

The § 1983 excessive force claim is also dismissed, because the evidence does not show that Officer McCarley shot, or otherwise made contact with, Ms. Williams. *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) ("Since there is no allegation that Officer Gilmore ever touched Brown, there can be no excessive force claim made against him."). Indeed, the totality of the evidence—and most importantly the video—shows that there is no genuine dispute of material fact as to who fired the fatal shot. Again, the parties agree that one of the final two

6

shots was the fatal shot. The video clearly shows gun smoke emanating from Officer Culbreath's pistol when the final two shots are fired.

Further, Mr. Mathis' affidavit, stating that the photo showing that the entrance wound of the fatal shot was in the right cheek "could possibly be a reverse photography photo," does not create a genuine dispute of material fact. Likewise, the obvious error in one part of an autopsy report—stating that the entrance wound was in the left cheek—does not create a genuine dispute of material fact. That error has been corrected by Ms. Gast's affidavit and clearly contradicts the other parts of the same autopsy report. The record establishes clearly that the fatal bullet entered Ms. Williams' right cheek, and plaintiff's own expert, Benny Webb, says[8] that Officer McCarley could not have struck Ms. Williams in the right cheek.

The court finds that Plaintiffs' remaining attempts to create a genuine dispute of material fact fail to do so. Officer McCarley's statement, taken shortly after the date of the event, is admittedly slightly inconsistent with his later filed affidavit. But, the video of the event establishes clearly what happened, and the statement is inconsistent with the video, while the affidavit is consistent with the video. The court, therefore, finds that the record shows that no genuine dispute of material fact remains as to Plaintiff's § 1983 excessive force claim because Officer Culbreath, not Officer McCarley, fired the fatal shot.

Lastly, the wrongful death cause of action is also dismissed because there is no predicate "wrongful act, neglect or default of another." S.C. Code Ann. § 15-51-10 ("Whenever the death of a person shall be caused by the wrongful act, neglect or default of another and the act, neglect

---

[8] Q: So Officer McCarley could've only shot her on the left side of her head—if—if he hit—hit her in the head, it would've been on the left side of her head or the back of her head?

A: That's correct. (ECF No. 33-5, p. 9).

7

or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, although the death shall have been caused under such circumstances as make the killing in law a felony. In the event of the death of the wrongdoer, such cause of action shall survive against his personal representative."). Similarly, because there is no claim against Officer McCarley, there can be no claim against the City of Rock Hill under any theory.[9]

## IV. CONCLUSION

Therefore, the court grants Defendants' Motion for Summary Judgment in its entirety, dismissing all claims asserted by Plaintiff.

IT IS SO ORDERED.

November 25, 2013  
Columbia, South Carolina

Joseph F. Anderson, Jr.  
United States District Judge

---

[9] The court notes that Plaintiffs would not be able to assert a § 1983 claim against the City of Rock Hill because "a municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

8